BAKER, JUDGE:
Claimants brought this action for damage sustained to their real property from a landslide allegedly
caused by the negligent maintenance of the drainage system on U. S. Route 19. U. S. Route 19 is a road maintained by respondent in Marion County. The Court is of the opinion to deny this claim for the reasons more fully set forth below.
In 1964 claimants purchased their residence which is situated approximately thirty feet below the road surface of U. S. Route 19, near Fairmont. U. S. Route 19 is a priority road that generally traverses in a north-south direction, but at this location the road traverses east-west. The West Fork River, which flows from the west to the east, is located about forty-five feet below claimants’ residence. The residence was originally built during the 1950's. In 1971, a bedroom was added to the residence. In 1991, claimants installed a septic tank behind their residence between the residence and the West Fork River. A garage, which was built about twenty to twenty-two years ago, is located on the east side of their residence. After a set of steps in front of the residence was washed away by water, claimants built a set *201 of concrete steps in front of the house on the east side of the residence. The steps start at road level and proceed to the bottom comer of the garage. On the west side of the property, there is an eight by ten foot building that was constructed about fifteen to eighteen years ago. Also, claimants installed guardrail in front of their residence after a vehicle being driven by an intoxicated driver crashed into their residence.
According to claimants’ son, Jeffrey Schrader, a flood occurred in 1985.[1] The West Fork River flooded above its bank to the extent that water was above the twelve feet difference in elevation from the river level to the foundation of the residence and flooded the basement of the Schrader’s residence. The flood did not cause any structural damage to the residence, but flood waters in the basement caused minor damage.
During the late 1980's, claimants began to experience considerable water run-off from U. S. Route 19. Jeffrey Schrader testified that the water appeared to resemble a “river coming down our front steps,” causing an accumulation of three to four inches of water in their front yard. After this water run-off began, claimants began to notice that the road surface was cracking and then it began sinking in one particular spot to a depth of about six to eight inches.
In 1993, claimants began to notice problems in the basement of their home. The basement wall on the north side of the house which faces U.S. Route 19 began to bulge toward the inside of the basement and cracks began to develop across the whole wall. The residence, which does not have guttering or down spouts, has had to have major repairs on two separate occasions.
In 1994, claimants determined that the wall on the north side of the residence facing the road was in a such a state of disrepair that they were required to rebuild the wall. This repair project took about two months to complete and cost approximately $10,000.00. Then in 1996, claimants were forced to undertake a second major construction project in an attempt to save their home from being pushed completely off its foundation. To accomplish this project, claimants' residence was placed on stilts and all four walls a long with the foundation were rebuilt. Claimants also had a foundation constructed for the storage building located to the west of the residence. This project took about three months to complete at cost of approximately $33,000.00.
Claimants contend that during the time beginning in 1989 or 1990 when the damage to their residence was occurring, they made telephone calls to respondent, wrote, letters, and personally contacted respondent on several occasions, but respondent did not take corrective measures until 1996. Jeffrey Schrader testified *202 that the drainage system on the opposite side of U. S. Route 19 does not function properly and he personally noticed water ponding on both sides of the road in the summer of 1998. After the retaining wall was constructed by respondent in 1996, Mr. Schrader dug a small drainage ditch on his property. This drainage ditch, about thirty feet from the residence, provides a path for the water to flow from the road into the West Fork River. Claimants are continuing to experience cracks in the basement on the west wall of their residence.
Along U. S. Route 19, across the road from the Schrader residence on the north side, there is a ditch from which the water flows into a culvert beneath the surface of the road. This culvert continues beneath claimants’ driveway for one-hundred fifty to two hundred feet. Then the culvert and drain proceed down to the river bank. The ditch and culverts were installed by a contractor at the direction of respondent. In accordance with the terms of a 1996 contract with respondent, the contractor on the projects was required to clean the culverts on the road to alleviate a standing water problem. Claimants contend that this drain has been the source of the problems which have occurred to their residence.
The position of respondent is that it has not been negligent in the maintenance of the ditch line on U. S. Route 19. In 1991, the road was determined to be in a state of disrepair. When respondent discovered the condition of its roadway, it placed hot patch on the road surface. Ini 996, the road was repaved and respondent installed a retaining wall. The retaining wall consists of a whaler across the top of the frame with lagging between vertical piles which are anchored into the rock beneath the ground level about twenty-five feet.[2] According to Marion County Crew Chief, Howard Swidler, the culverts are checked when necessary and these culverts were checked after 1996 and appeared to be “wide open, clean as a whistle.” However, Mr. Swidler admitted that he did not personally check the culverts because he did n ot b elieve there w as a p roblem. Bo th Mr. Swidler and M arion C ounty Foreman, Bill Ray Lane, testified that they were aware of flooding problems in the area t hat w ere c aused b y t he r iver a bout o ne m ile f arther a long t he r oad. Bo th testified that the river, on occasion, flooded and required the road to be closed to the west of claimants’ property.
Dr. Lyle K. Moulton, claimant’s geotechnical expert in soils and foundations, examined claimants’ property on four occasions from November 1997 - February 1999. It is his opinion that respondent has not responded properly to the cause of the landslide which affects not only claimants’ property but also U.S. Routel9. Dr. Moulton testified that the particular slide involved in this claim probably has existed since the late 1980's, but he was unable to identify what *203 originally caused the landslide. He is of the opinion that this slide is progressive in nature, meaning that it begins at the top above the road and is progressing down the slope toward the West Fork River with claimants’ property between the road and the river. When respondent constructed the retaining wall in 1996, it addressed the landslide only as far as U.S. Route 19 is concerned. There is now a crack in the ground in front of the retaining wall which is approximately one and a half inches wide and twelve feet long. This crack proceeds through the property to the south of the retaining wall. In his opinion this is evidence of the slip plane where the residual sliding is taking place all the way to the river. Dr. Moulton suspects that water is flowing horizontally under the roadway, from the side farthest away from claimants’ residence f rom a n u ndetermined s ource t oward t heir p roperty, r emoving g ranular material beneath the surface of the road thus causing the road to fall and collapse. He noted that the road is giving way and must be patched with asphalt where it is sinking. The timber lagging does not go all the way down, so rock used behind the wall on one side works its way out from under the lagging on the top. The fill material between the road and the retaining wall is falling down the slope at the top of claimants’ property. Dr. Moulton is of the opinion that respondent should have anticipated that this landslide would continue to cause problems farther down the slope affecting the stability of claimants’ property.
Further, D r. M oulton t estified t hat t he 1 andslide a rea w as a ggravated b y respondent’s road work. The continued resurfacing of the pavement added a substantial thickness of material, which has a substantially higher unit weight than the soil itself. The existing limiting equilibrium system was aggravated by respondent’s maintenance of the road when it added more weight to the top of the slope by resurfacing the roadway, which caused further movement in the slope. A stability analysis performed by Dr. Moulton indicates that this situation took place over such a long period of time that there was sufficient movement in the slope so that the residual strength of the soil was mobilized.[3] Since the weight of the road probably exceeded the peak strength, Dr. Moulton believes that the analysis shifted *204 to residual strength.[1] Dr. Moulton believed that data from 1998 to February 1999 establish that the slide begins in the middle of U. S. Route 19 and proceeds to below the toe of the slip which is in the West Fork River. Additionally, Dr. Moulton was of the opinion that traffic proceeding over the road was another significant factor affecting the landslide.
Dr. Moulton rejected Dr. George A. Hall’s , a geotechnical engineer employed by respondent, expert opinion that the landslide is a retrogressive slide and began at the toe of the slope. Dr. Moulton asserts that his observations of the river did not indicate that the landslide starts from the bottom of the slope, rather it began at the top of the slope above the road. During his on site visits to the Schraders’ property, Dr. Moulton observed cracks in claimants’ residence proceeding down the slope. The basement wall has moved outward, but there is not much movement in the vertical face of the south wall. While the cracks on the residence appeared before the tension cracks, Dr. Moulton believed that the residence’s foundation, during construction, may have been the cause. Except for the tension cracks at the top of the road, there were no other scarps or clear signs of a step-wise failure. If the 1 andslide is a retrogressive slide, Dr. Moulton is of the opinion that it would have affected claimants’ residence before affecting the road. However, Dr. Moulton indicated that the road, not the Schrader residence, was affected. Further, Dr. Moulton asserts that Dr. Hall’s failure to depict the river level explained the destabilizing effect obtained by Dr. Hall’s stability analysis. All of the factors considered by Dr. Moulton led him to the conclusion that there was a progressive slide beginning at the road and moving toward the river bank. As this slide moves, it is causing the damages to claimants’ property and residence.
Dr. Hall is of the opinion that the landslide which is causing the damage to claimants’ property and to respondent’s road (U.S. Route 19) begins at the bottom of the slope. According to Dr. Hall, this slide apparently started in the mid-1980's and moved its way up the slope through claimants’ property to U.S Route 19. This particular slide is thus retrogressive in nature rather than progressive, i. e., the slide is moving up the slope rather than down the slope as is the usual scenario for slides. Dr. Hall asserts that Dr. Moulton admits that the peak strength of the soil would have existed before there was a landslide at that location. According to Dr. Hall, this admission supports his theory that the only place for a failure to occur was at the bottom of the slope. Using a stability analysis utilizing residual strength, Dr. Hall observed that there was no failure once the slip plane formed all the way to the road.
*205 There was a lot of water pressure from the 1985 flood which would have saturated that slope. Dr. Hall calculated the water level of the river to be twenty feet higher than the water level was prior to the flood. Dr. Hall opined that the water pressure and velocity from the higher water level would have been sufficient to cause ground erosion in the river bank. With the erosion and saturation of the soil in the lower part of the slope, when the river went back down a failure in the lower part of the slope was initiated. This condition, which eventually created a scarp, was not a total failure but it reached peak strength and probably exceeded it slightly, which allowed that material to move and remove support from the above material. At the time the piling was installed for the retaining wall, the water table was almost at the ground surface. Dr. Hall explained that additional water is coming from a previous mine, a coal seam or some typical stratum that puts water into the ground, which is á natural condition. The septic tank, added by claimants to their property in 1991, further saturated the soil with approximately one-hundred-fifty gallons of water per day. At this point, the slippery clay-silt soil at the toe of the slope became lubricated which led to the retrogressive failure and the slide which eventually moved up toward the road. Likewise, Dr. Hall observed a current residual failure in the slope, which he believes substantiates his opinion that this is a retrogressive slide with the failure starting at the bottom of the slope. Dr. Hall further testified that he did not include the river in the stability analysis because that is where the water level was at the time of the investigation.
Dr. Hall testified that an important difference between his and Dr. Moulton’s expert opinions regards a scarp on the Schrader property. Dr. Moulton believes a scarp is a necessary sign of a retrogressive slide, while Dr. Hall believes that a scarp is not a necessary sign for a retrogressive slide. According to Dr. Hall, when the soil b elow p ulls a way, t here is s ome t ension a nd t he s oil c an e xpand. Cracks and deformations can develop in the soil. In the bottom portion of the slip, the material is being pushed and compressed. If material at the bottom moves and the support is removed at the bottom, then the slip can move further up the slope. Then, when there is a crack above, this moves slightly down the slope, removing support from material further up the slope and the landslide continues to progress further up slope with each step, creating what Dr. Hall described as a “domino effect.” If pressure is reduced, resistance is reduced for the next block of material, and the effect continues. Thus, a scarp is not necessary and is a matter of pressure between the different pieces of the eventual slide. He provided evidence of this opinion in photographs of the ground surface on the south side of claimant’s property near the West Fork River which revealed small cracks in the soil.
Additionally, Dr. Hall disagrees with Dr. Moulton that the patching placed by respondent on U.S. Route 19 aggravated the landslide. Dr. Hall is of the opinion that the pavement irregularities developed after the cracks formed south of the retaining w all c reating a m aterial v oid a nd c ausing t he m aterial f rom b ehind t he *206 piling to fall through the timber, thus pulling soil from beneath the road surface and causing the pavement to sink. Accordingly, it is his opinion that a retrogressive slide beginning below claimants’ residence at the West Fork River is the proximate cause of the damage that has occurred and it is the cause of the continuing damage to claimants’ residence and property.
The Court has held that respondent has a duty to provide adequate drainage of surface water, and drainage devices must be maintained in a reasonable state of repair. Haught vs. Dept. of Highways, 13 Ct. Cl. 237 (1980). In claims of this nature, the Court will examine whether respondent negligently failed to protect a claimant’s property from foreseeable damage. Rogers vs. Div. of Highways, 21 Ct. Cl. 97 (1996). In the claim of Mount v. DOH, Opinion issued January 28, 2000, this Court held that respondent was responsible for a slide occurring on claimant’s property when it continually placed asphalt on the road above claimant’s property without regard to the effect of the additional weight on the soil beneath the road surface. Although the slide was progressing from above the road, the weight of the road caused the slide to progress further below the road, causing damage to claimant’s property. Maintenance of the drainage ditch adjacent to the road allowed water to saturate the soil thus providing a slip plane for the slide. The claim herein presents a case of first impression for this Court as one of t he e xperts is of the opinion that the proximate cause of the damage to claimants’ property is the result of a retrogressive slide. This Court has not had a claim of that nature prior to the instant claim. However, after due consideration of the testimony of both experts, the Court has reached the conclusion that the evidence herein does make a case for a retrogressive slide rather than a progressive slide. The fact that there is evidence of cracking in the soil at and near the West Fork River; that the south basement wall of the house is beginning to fail again; the slope is elongating as the toe of the landslide is moving faster than the head of the landslide; and that there is evidence of the soil cracking at the south edge of the retaining wall all seem to the Court to substantiate the theory put forth by Dr. George Hall that this is in fact a retrogressive slide. It is an unusual phenomenon but the Court is of the opinion that Dr. Hall is correct in his analysis of the situation herein.
Further, the Court is of the opinion that respondent, once on notice of the situation on U. S. Route 19, took immediate and reasonable action to prevent any further drainage onto claimants’ property from the landslide and excess water flowing across the road onto their property. The Court finds that the terrain in this area of U. S. Route 19 is typical of many areas in West Virginia which are subject to landslides. In the instant claim, claimants have failed to established that respondent maintained U. S. Route 19, in Marion County, in a negligent manner. While the Court is sympathetic to the situation of claimants, the fact remains that there are many factors which have brought about this particular landslide problem affecting their property, including the unusually high water in 1985, the natural drainage area *207 and the location of the residence. Consequently, there is insufficient evidence of negligence on the part of respondent upon which to base an award.
In accordance with the finding of facts and conclusions of law stated herein above, the Court is of the opinion to and does deny this claim.
Claim disallowed.

 The Court takes official notice of the fact that in 1985 heavy rainfall produced tremendous flooding in the area in question.

 “Lagging” is material, usually timber or steel, that is placed between or behind the flanges of the piles in order to hold material that is secured.

 A “stability analysis,” also known as a “Bishop analysis,” is a computer program that tries to determine the critical center circle that would produce the lowest factor of safety, which would be indicated by a value of “1.” This process is done by repeating the analysis many times, moving the center around and calculating the factor of safety for any circle through a particular point. The computer program keeps resolving the problem until it finds the lowest factor of safety, which is the minimum factor of safety for the particular analysis. Eventually ths program establishes where a landslide is occurring.

 “Peak strength” is when the soil is loaded up, there is a stress strain response where the shear stress develops to a certain peak level. As the deformation continues it levels out, which leave the “residual strength,” which can be substantially below the peak strength.